UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

JOHNNY L. TAYLOR,                )
                                 )
              Plaintiff,         )
      v.                         )    1:09-cv-628-WTL-DML
                                 )
BOB-ROHR-INDY MOTORS,            )
                                 )
              Defendant.         )

**Entry Discussing Motion for Summary Judgment
and Directing Further Proceedings**

### I. Background

Johnny L. Taylor ("Taylor") was employed by Rohr Indy Motors, Inc. d/b/a Indy Motorwerks ("Indy Motors") (identified in the complaint as Bob-Rohr-Indy Motors, Indy Hyundai, Isuzu, Suzuki) from November 2007 until February 9, 2009. Taylor alleges that he was harassed on the job and discriminated against by Indy Motors because of his race in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-5. Taylor alleges that a general sales manager, James Mueller, hit him and called him a "n**r" in October 2008 and called him a "n**r" again on February 6, 2009. Taylor further alleges that he was sent home and then terminated for being falsely accused of threatening a co-worker. Indy Motors seeks resolution of Taylor's claims through the entry of summary judgment.

For the reasons explained in this Entry, Indy Motors' motion for summary judgment (dkt 44) is **granted in part and denied in part**.

Although Taylor titled his filing of April 16, 2010, "plaintiff's motion for summary judgment," he has not presented a separate statement of material facts as required by Local Rule 56.1. Moreover, in his motion he asks that the court allow the case to be heard in the courtroom and to please not dismiss this case. He does not ask for judgment in his favor, nor is such judgment warranted. Therefore, the plaintiff's filing is treated as his response to the defendant's motion for summary judgment and not as a cross-motion for summary judgment. To the extent the docket reflects Taylor's filing of April 16, 2010 (dkt 49), as a motion, that motion is **denied.**

## II. Discussion

### A. Summary Judgment Standard

"As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1103 (7th Cir. 2008) (citations omitted). Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." **FED.R.CIV.P.** Rule 56(c). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney,* 526 F.3d at 1104 (internal citations omitted). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

### B. Undisputed Facts

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the following facts are undisputed for purposes of the defendant's motion for summary judgment:

Taylor applied for a position with Indy Motors after seeing a "help wanted" sign. Taylor explained to the general manager at that time that he was homeless, living in his car and needed a job. Although he had no experience selling cars, the general manager agreed to give him a chance. Taylor began working at Indy Motors in November of 2007.

Taylor was a good salesperson. Taylor was salesperson of the month in October 2008 and again in December 2008 and was second by only one car to fellow African-American salesperson Sean Brennan for salesperson of the month in January 2009.

On Thursday, October 16, 2008, around 6:00 p.m., Sales Manager James Mueller ("Mueller") noticed that Taylor was not at the dealership although he was scheduled to work until 9:00 p.m. The next day, October 17, Mueller asked Taylor about his whereabouts the

night before. Taylor admitted that he had left early without permission but he told Mueller that Mueller could not tell him when he could and could not leave. Later that day, Mueller asked Taylor to assist another sales person with balloons. Taylor told Mueller in a disrespectful tone that he had done his share and that the other salesperson could do it himself.

Sometime during the week of October 13, 2008, Mueller boasted about lasagna he intended to bring in for the salesperson's lunch that Saturday, October 18. The dealership normally provides lunch for its salespeople on Saturdays because it is a busy day and the salsespeople are not permitted to leave the dealership. On Saturday morning, October 18, several employees were standing around the sales tower talking and laughing when Taylor approached. Mueller commented that he had not had time to make the lasagna he had promised. As Taylor approached, salesperson John Olds ("Olds") commented to Taylor, "Hey John, guess what we having for lunch today?" Olds told Taylor they were having pizza. Taylor commented something to the effect that he had been "looking forward to that famous lasagna James Mueller makes." Taylor also said that Mueller was "not a man of his word." This angered Mueller who Taylor claims then hit him on the shoulder, called him "n\*\*r" and told Taylor he better not ever disrespect him in front of his sales people. Taylor claims Mueller then escorted him around the corner and said something to the effect, "John, you think we owe y'all people something."[1]

Taylor worked the rest of the day, leaving just ten minutes before the end of his shift. Taylor had a few customers commit to buying a vehicle that day. He was the only salesperson to make a sale that day.

Indy Motors' harassment policy, which Taylor read and signed, states in relevant part:

> If you feel you are being harassed by any other associate, supervisory or nonsupervisory, because of your race, color, sex, religion, national origin, age or handicap, or are subjected to sexual harassment, YOU SHOULD AT ONCE MAKE YOUR FEELINGS KNOWN IN WRITING to your supervisor or any other appropriate company official. . . . If you do not feel that the matter can be brought up with your supervisor, address your concerns with the Company Harassment Officers. . . . The Company Harassment Officers in Indianapolis, Indiana are: Barb Hall, Officer Manager Ext: 250 and Tim Woodall, Parts Manager Ext: 265.

Taylor never submitted a written report regarding Mueller calling him a "n\*\*r." Roughly forty hours after Mueller allegedly hit him, Taylor went to the emergency room. X-rays confirmed he had no fracture, subluxation, or dislocation. Taylor's soft tissues were "unremarkable." The nurse reported that Taylor's skin was natural color and that Taylor moved bilateral arms without difficulty. Nevertheless, Indy Motors paid the cost of Taylor's x-rays. Taylor had no follow-up treatment on his shoulder and did not address the incident with his family physician.

---

[1] Mueller denies saying anything derogatory or racial in nature.

General Manager Troy Owen ("Owen") was on vacation in October and returned to work on Monday, October 20, 2008. That morning, Owen received an email from Mueller regarding the three incidents involving Taylor which occurred on October 16, 17, and 18, during Owen's vacation. Owen forwarded the email to Office Manager Barb Hall ("Hall").

Hall scheduled a meeting in her office at 11:30 a.m. on October 20, 2008. Taylor, Mueller, Owen, and Hall attended the meeting. During the meeting Mueller reported that Taylor had called him a liar, was out of hand and left before the end of his shift. The attendees differ in their recollection as to whether Taylor reported that Mueller hit him and called him a "n**r."[2] Taylor testified in his deposition that during the meeting on October 20, he reported Mueller had hit him and called him a "n**r." Owen, acting as mediator, told Taylor and Mueller they did not have to love each other, but if they were both going to work for Indy Motors, they would have to get along. Taylor and Mueller agreed that they could get along with each other.

After the meeting, Owen questioned other employees about what they had observed on October 18 between Taylor and Mueller. Salesperson Olds and salesperson Sean Brennan ("Brennan"), who is himself African-American, voluntarily provided written statements about what they saw. Their statements were consistent with what Mueller stated in the meeting.

On December 10, 2008, Taylor went to the Equal Employment Opportunity Commission ("EEOC") to inquire about filing discrimination charges on the basis of disability and religion, but not race. Taylor completed an intake questionnaire. In answering the questionnaire, Taylor mentioned that Mueller "hit" him on his left shoulder on which he had had rotator cuff surgery several years earlier. Taylor asked EEOC representative Karen Allen ("Allen") during the interview whether he could file for disability discrimination. Taylor also reported that "Mr. Mueller told him don't pray for him or his father" (Mueller's father had been ill) and Taylor asked if he could therefore file for religious discrimination.

Taylor did not tell Allen of the "n**r" comment that Mueller allegedly made on October 18, 2008. When he visited the EEOC on December 10, 2008, Taylor knew the EEOC investigated complaints of race discrimination. Taylor chose not to file a charge at that time and signed an EEOC "Summary of Rights" document indicating that Allen had explained the various statutes the EEOC investigates and the time frames for filing charges under those statutes.

On February 4, 2009, salesperson Brennan wrote a note to General Manager Owen regarding a phone call he had received from a customer of Taylor's. Though not in these exact words, Brennan's note relayed the following information:

> I received a call from a customer who expressed to me that she was upset because John Taylor had not followed up with her regarding a Mazda 626. The customer wanted to know how long it would take for the car to get fixed. She was anxious to test drive it and wanted to purchase it for her son. I put

---

[2]In their respective sworn affidavits, Hall, Mueller and Owen deny Taylor reported that Mueller allegedly called him a "n**r" or mentioned anything regarding race or racial discrimination.

4

the customer on hold and spoke with Jim Mills, who informed me that the car needed a lot of work and that he would begin work on it as soon as the Repair Order had been approved. I informed the customer of this and told her I would leave a note for the General Manager in an attempt to speed up the process.

On Friday, February 6, 2009, Owen, prompted by Brennan, questioned Taylor about the note. Taylor reported that Business Manager Hakan Cekirge had given him the note, so Owen left to call Cekirge to verify Taylor's story. Taylor states that Mueller was sitting at a computer nearby, and that Mueller then said, "N**r," don't you be standing in front of me."

In a report Brennan prepared for Owen on February 6, Brennan reported that while Owen was on the phone, he asked Taylor where the note was that he had left for Owen. Brennan further reported that Taylor responded stating, "it doesn't matter," then proceeded to threaten Brennan, stating words to the effect, "You better watch yourself or else[3]" while walking toward Brennan and pumping out his chest in a threatening and intimidating manner. Brennan reported that Mueller then approached and calmly asked Taylor to keep his voice down. According to Brennan's report, Taylor then turned on Mueller, yelling. Brennan reported that Taylor responded to Mueller's request that he keep his voice down by saying, "No, why should I? What are you going to do, huh? Hit me again. Go ahead, hit me. Hit me. Come on, I am right here" or words to this effect. According to Brennan's report, Mueller remained calm throughout the exchange despite Taylor's obvious attempts to provoke him.[4]

Upon learning of Taylor's confrontation with Brennan and Mueller, Owen asked Taylor and Mueller to follow him to an office where they could talk privately. While in the office, Taylor became visibly upset, began to stare at Mueller, clench his fists and shake in what Owen perceived to be an intimidating and aggressive manner. Mueller told Taylor not to stare at him and Taylor responded that God gave him eyes and he could look anywhere he wanted. Taylor claims he asked Owen if he heard Mueller call him "n**r."[5] Owen sent Taylor home for the weekend and told him to call Monday before he came in. Owen told Taylor he was sending him home because he threatened Brennan.

After Taylor left for the day, Brennan told Owen he was very uncomfortable with Taylor's threatening behavior. He further explained that he thought Taylor's overall conduct both on Friday February 6 and on previous occasions was a major problem for the dealership as a whole, hindered business and was bad for employee morale. Brennan put his concerns in writing at Owen's request. Before he terminated Taylor, Owen spoke with Mueller and Brennan, both of whom reported that Taylor had acted in an aggressive and threatening manner. When Taylor called in on Monday, Owen told him his employment had been terminated.

---

[3]Taylor denies saying this to Brennan, but for purposes of this motion, it is undisputed that this is what Brennan reported to Owen.

[4]Brennan never heard Mueller use the term "n**r" or make any racially derogatory statement to Taylor or anyone else. Taylor admits he had a confrontation with Brennan, but denies making threats. He claims he told Brennan to "see his way out of his business."

[5]Owen denies this occurred.

Owen never observed or heard about any other employee at Indy Motors making threats, acting as aggressively or acting in such an insubordinate manner as Taylor did on February 6, 2009. Owen terminated Taylor because he received a report from Taylor's co-worker Brennan that Taylor had acted in an inappropriate, aggressive and threatening manner toward Brennan and toward his Sales Manager Mueller on February 6, 2009. Owen's decision was bolstered by some of Taylor's other past conduct in which he had been insubordinate and aggressive in his actions toward Owen.

Taylor filed his EEOC charge on the morning of February 9, 2009, several hours before he knew his employment was being terminated.

### C. Statutory Overview

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against individuals on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "It is well-established that a plaintiff in a Title VII case may proceed under a direct or indirect method of proof." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004); *see also Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Direct evidence is evidence that, if believed by the trier-of-fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997). The direct evidence must show that the defendant said or did something indicating discriminatory animus with regard to the specific employment decision in question. *Id.* In short, "[d]irect evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers,* 320 F.3d at 753 (internal quotation omitted). "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Rhodes v. Ill. Dept. of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir. 1994)). "That circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" *Id.* (quoting *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)).

In this case there is no direct evidence that Owen, the decision-maker, said or did anything indicating that his decision to terminate Taylor's employment was based on Taylor's race. The alternative method is the indirect burden-shifting method of proof established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802-04 (1973). Under *McDonnell*, Taylor must make a *prima facie* case on his race discrimination claim by showing that he (1) belongs to a protected class; (2) performed his job according to his employer's legitimate performance expectations; (3) suffered an adverse employment action; and (4) was treated less favorably compared to similarly situated employees outside of the protected class. *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 364-65 (7th Cir. 2009). If Taylor establishes a *prima facie* case, then the burden shifts to the defendant to set forth a legitimate, nondiscriminatory reason for its employment decision. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004). If the defendant makes such a showing, the burden shifts back to Taylor to explain why the defendant's proffered justification was merely a pretext for discrimination. *Id.* A pretext is "a dishonest explanation, a lie rather than an oddity or an error." *Id.* (internal quotation omitted).

6

To survive summary judgment on his hostile workplace claim, Taylor must show that: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 634 (7th Cir. 2009). Whether an employer may be liable hinges on whether the harasser was the plaintiff's supervisor or a co-worker. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). In a case such as this where the alleged harassment was perpetrated by a supervisor, the employer is subject to strict liability subject only to an affirmative defense that the plaintiff suffered no tangible employment action. *Id.*

### D. Analysis

*Termination Claim*

In his complaint filed on May 9, 2009, Taylor alleges that on February 9, 2009, "I lost my job." The complaint states a claim for racially based employment discrimination.

Indy Motors first argues that Taylor failed to preserve a claim that his employment termination was based on race because Taylor did not file such a charge with the EEOC. Generally speaking, if a claim is not included in an EEOC charge, the plaintiff is barred from pursuing that claim in district court. *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010). Taylor filed his EEOC charge several hours before his employment was terminated on February 9, 2009. Indy Motors points out that Taylor did not amend his charge to add a claim of termination. Taylor states in his deposition that he "can care less about my termination with Bob Rohrman." He further stated, however, "Yes, let's put it [sic] part of the case," and he alleged in his complaint that he lost his job. "A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if [his] allegations fall within the scope of the earlier charges contained in the EEOC complaint." *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005) (internal quotation omitted).

"[T]o determine whether a claim raised in a complaint is within the scope of the earlier-filed EEOC charge, we ask what EEOC investigation could reasonably be expected to grow from the original charge." *Id.* at 1047. The termination occurred on the same day the EEOC charge was filed. The individuals involved were the same for the claim of harassment as for the claim for employment discrimination. Given the proximity in time and similarity of personnel, Taylor's termination could be viewed to be relevant to and an outgrowth of the original allegations of harassment, and thereby reasonably falls within the scope of the original investigation. For purposes of this motion, the court will consider Taylor's claim of discrimination based on the termination of his employment.

Although the court has deemed it appropriate to consider this claim, Taylor has not succeeded in presenting sufficient evidence to create a genuine issue of material fact. Taylor has failed to show that he satisfied two elements of a *prima facie* discrimination claim. He has not shown that he performed his job according to the legitimate performance expectations of Indy Motors, nor has he presented evidence that he was treated less favorably compared to similarly situated employees outside of his protected class.

The undisputed evidence shows that although Taylor was a good salesman, he had been counseled about his being disrespectful toward his general manager and another (African American) co-worker. The incident on Friday February 6, 2009, which was regarded as insubordination and threatening behavior, resulted in the termination of Taylor's employment the following Monday. Insubordination and threats fall outside the scope of acceptable behavior at any work-site. In addition, Taylor has not identified any Caucasian employee who engaged in insubordinate and threatening behavior at work whose employment was not terminated. For these reasons, Indy Motors is entitled to summary judgment on any employment discrimination claim that may have been asserted by Taylor.

*Harassment Claim*

As noted above, to survive summary judgment on his harassment claim, Taylor must present evidence showing that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. Because the evidence is conflicting, there is a genuine issue of fact as to whether supervisor Mueller called Taylor the "n" word. The court must assume for purposes of this motion that supervisor Mueller called Taylor the "n" word on October 18, 2008, and again on February 6, 2009. "Whether words or conduct were unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the factfinder." *Hrobowski,* 358 F.3d at 476. In this case, there is no evidence that Taylor actually welcomed or participated in using racially charged words in the workplace. A reasonable jury could find that such language was unwelcome. In addition, there is no dispute that such language was based on Taylor's race.

Turning to the third prong of the *prima facie* case, Indy Motors contends that Taylor has failed to show that the alleged harassment was sufficiently severe or pervasive so as to alter the conditions of Taylor's work environment. To establish that the harassment was "severe or pervasive," Taylor must show that "the work environment was both subjectively and objectively offensive." *Smith v. Northeastern Illinois University*, 388 F.3d 559, 566 (7th Cir. 2004). Indy Motors does not address the "objective" aspect of this element, rather it argues that Taylor himself did not subjectively perceive his work environment as offensive.[6]

As to the subjective component of the inquiry, Taylor need only establish that "he perceived the environment to be hostile or abusive." *Hrobowski,* 358 F.3d at 477. Indy Motors argues that the evidence shows that Taylor himself did not experience the work environment as hostile because when Taylor went to the EEOC in December of 2008, he did not mention the alleged October 2008 racist comment by Mueller. Also, Taylor made no written report to any supervisor or manager of being called the "n" word. Indy Motors also argues that the alleged harassment did not negatively effect Taylor's ability to perform his job, as he continued to earn high sales in October and December. While these facts tend to weigh on the side that Taylor was not disturbed by the remarks, they do not

---

[6]Indy Motors does not reach the element of whether there was a basis for attributing employer liability. The court recognizes that because the alleged harasser in this case is Mueller, Taylor's supervisor, Indy Motors would be subject to strict liability. *See Hrobowski,* 358 F.3d at 477. As noted above, strict liability would be subject only to a defense that Taylor had not suffered a tangible employment action, but in this case, there was a tangible employment action. Taylor's employment was terminated.

necessarily compel a finding that there is no genuine issue as to this element. These arguments aptly reflect the defendant's disbelief that Mueller ever called Taylor the "n" word; however, as noted, the court must accept as true for purposes of this motion Taylor's accounts.

Taylor asserts that he reported the use of the "n" word to managers Hall and Owen, although not in writing. In his deposition, Taylor stated that Mueller hit him on the shoulder and called him the "n" word when Mueller was upset about a comment Taylor made. Taylor testified that when that happened, Taylor was very angry and Taylor "wanted to knock the sh - - out of him," but he knew he would lose his job, so he did not hit Mueller back. Taylor further testified that Mueller also said "you people think we owe you something." Taylor testified that he believed that in Mueller's position, Mueller had no right to put his hands on Taylor and had no right call him the "n" word.

"The use of racial epithets is deplorable and this court has recognized that the use of the word 'nigger' can have a highly disturbing impact on the listener." *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) (internal quotation omitted). The Seventh Circuit Court of Appeals has "acknowledge[d] that a supervisor's use of the term impacts the work environment far more severely than use by co-equals." *Id.* (internal quotation omitted). Here, the remark was made directly to Taylor. It was made by a supervisor, not by a co-worker. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993) (internal quotations omitted). "While there is no 'magic number' of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (citing *Rodgers*, 12 F.3d at 675). Taylor testified that Mueller called him the "n" word on two occasions, and that Mueller also made a comment about "you people." Taylor testified about being angry when Mueller called him the name and hit him, but that because of his fear of losing his job, he had to be careful as to how he reacted. A reasonable jury could find that Taylor did in fact perceive the work environment created by Mueller to be hostile or abusive. Therefore, there is an issue of material fact as to whether the alleged harassment was sufficiently severe or pervasive to satisfy the third element of Taylor's *prima facie* case.

### III. Conclusion

For the reasons set forth in this Entry, the defendant's motion for summary judgment (dkt 44) is **granted in part and denied in part.** The defendant's motion for summary judgment is **granted** as to Taylor's claim of discrimination based on the termination of his employment. The defendant's motion for summary judgment is **denied** as to Taylor's claim of hostile environment. As noted above, the plaintiff's motion (dkt 49) is **denied.** No partial final judgment shall issue at this time as to the claim resolved in this Entry.

The Magistrate Judge is requested to schedule a status/settlement conference to determine the further development and resolution of the plaintiff's hostile environment claim.

**IT IS SO ORDERED.**

Date: 10/18/2010

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Jeffrey B. Halbert
STEWART & IRWIN P.C.
jhalbert@silegal.com

James J. Hutton
OFFICE OF THE INDIANA ATTORNEY GENERAL
james.hutton@atg.in.gov

Suzanne S. Newcomb
STEWART & IRWIN P.C.
snewcomb@silegal.com

Johnny L. Taylor
4725 Madison Ave.
Apt. 51
Indianapolis, IN 46227

Magistrate Judge Debra McVicker Lynch